## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| THOMAS FORTON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TEN: PUBLISHING MEDIA, LLC, a Delaware limited liability corporation,<br><br>Defendant. | Case No. 19-cv-11814<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Thomas Forton ("Plaintiff"), individually and on behalf of himself and all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## INTRODUCTION

1.      Between June 19, 2016 and July 30, 2016, Defendant TEN: Publishing Media, LLC ("TEN") rented, exchanged, and/or otherwise disclosed personal information about Plaintiff Thomas Forton's *Hot Rod* magazine subscription to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed his information to aggressive

advertisers, political organizations, and non-profit companies.  As a result, Mr. Forton has received a barrage of unwanted junk mail.  By renting, exchanging, and/or otherwise disclosing Mr. Forton's Personal Reading Information (defined below) between June 19, 2016 and July 30, 2016, TEN violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[1]

2.      Documented evidence confirms these facts. For example, a list broker, NextMark, offers to provide renters access to the Personal Reading Information of 222,479 active U.S. subscribers to *Hot Rod* magazine, at a base price of "$110.00/M [per thousand]," (i.e., 11 cents apiece), as shown in the following screenshot of the "HOT ROD MAGAZINE Mailing List" page on NextMark's website:

---

[1] In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case.  *See Horton v. GameStop, Corp.*, -- F. Supp. 3d --, 2018 WL 8335635, at *2-3 (W.D. Mich. Sept. 28, 2018).

2



See Complaint Ex. B.

3.     Renters are able to access the Personal Reading Information of *Hot Rod* magazine subscribers based on, but not limited to, their "gender" as well as other matching and targeting data. *Id.*

4.     TEN also offers access to its "TEN: THE ENTHUSIAST

3

NETWORK AUTOMOTIVE MASTERFILE Mailing List" at the same base rate of "$110/M."

1 Start   2 Results   3 Data Card   4 Request   5 Finished

# TEN: THE ENTHUSIAST NETWORK AUTOMOTIVE MASTERFILE Mailing List

(Formerly Source Interlink Media) TEN - The Enthusiast Network has one of the largest male enthusiast databases on the market today. Their publications cover almost all major male interests groups such as Automotive, High-Tech, and Action Sports. They have over forty individual titles including well known magazines such as Motor Trend, Automobile Magazine, Hot Rod, Stereophile and Surfing.

| SEGMENTS | | | | POPULARITY: | ▬▬▬▬ 99 |
|---|---|---|---|---|---|
| 1,007,385 | TOTAL UNIVERSE / BASE RATE | *COUNTS THROUGH 05/22/2019* | $110.00/M | MARKET: | CONSUMER |
| 1,007,385 | ACTIVE U.S. AUTO SUBS | | $110.00/M | CHANNELS: | ✉ |
| 50,791 | 1 MONTH H/L AUTO SUBS | | + $16.00/M | SOURCE: | 60% DTP |
| 157,984 | 3 MONTH H/L AUTO SUBS | | + $11.00/M | PRIVACY: | UNKNOWN |
| 336,906 | 6 MONTH H/L AUTO SUBS | | + $6.00/M | DMA?: | YES - MEMBER |
| 326,864 | 12 MONTH AUTO EXPIRES | | $85.00/M | STATUS: | STANDARD PROVIDER |
| 24,512 | ACTIVE CANADIAN AUTO SUBS | | $125.00/M | GEO: | USA |
| 175,300 | OPT-IN EMAIL ADDRESSES | | $150.00/M | GENDER: | 9% FEMALE 88% MALE |
| | NON-COMPETITIVE CATALOG | | $80.00/M | | |
| | FUNDRAISER RATE | | $75.00/M | | |

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | $16.00/M |
| 3 MONTH HOTLINE | $11.00/M |
| 3RD PARTY BLOW IN | $10.00/M |
| 6 MONTH HOTLINE | $6.00/M |
| ADDR CHANGE | $11.00/M |
| AGE | $16.00/M |
| GENDER/SEX | $9.00/M |
| HOME OWNER | $16.00/M |
| INCOME SELECT | $16.00/M |
| LIFESTYLE | $16.00/M |
| NON RECIPROCAL FEE | $11.00/M |
| PAID | $11.00/M |
| PUBLICATION | $10.00/M |
| RENTER | $16.00/M |
| SCF | $9.00/M |
| SOURCE | $11.00/M |
| STATE | $9.00/M |
| ZIP | $9.00/M |

**DESCRIPTION**

(Formerly Source Interlink Media)

TEN - The Enthusiast Network has one of the largest male enthusiast databases on the market today. Their publications cover almost all major male interests groups such as Automotive, High-Tech, and Action Sports. They have over forty individual titles including well known magazines such as Motor Trend, Automobile Magazine, Hot Rod, Stereophile and Surfing.

TEN - The Enthusiast Network has merged and enhanced the subscriber files of its over 25 automotive magazine titles with key lifestyle and demographic data that allows access to a devoted audience of car and truck lovers. TEN - The Enthusiast Network automotive enthusiasts possess a passion for their own vehicles and the automotive world at large. They are not just spectators; they are doers, active and passionate about their sport or interest. These men maintain households with above average incomes; they are educated, with the majority being over thirty five years old and married.

  Street Rod titles include: Classic Trucks and Street Rodder.

Performance Automotive titles include: Car Craft, Chevy High Performance, Hot Rod, Hot Rod Deluxe, Mopar Muscle, Muscle Mustangs & Fast Fords, Mustang Monthly, Super Chevy and Vette.

Muscle Car titles include: Chevy High Performance, Hot Rod, Mopar Muscle, Muscle Car Review, Mustang Monthly, Muscle Mustang & Fast Fords, Street Rodder, Super Chevy and Vette.

| ADDRESSING | |
|---|---|
| KEY CODING | $2.00/M |
| EMAIL | $55.00/F |
| FTP | $55.00/F |

**RELATED LISTS**

- 📄 EPSILON SHOPPER'S VOICE U.S. - VEHICLE
- 📄 HEMMINGS MOTOR NEWS SUBSCRIBERS
- 📄 PUBLISHERS CLEARING HOUSE MERCHANDISE BUYERS
- 📄 HEMMINGS CLASSIC CAR MAGAZINE
- 📄 CHEVYMALL.COM
- 📄 HEMMINGS MUSCLE MACHINES MAGAZINE
- 📄 HEMMINGS PUBLISHING MASTERFILE
- 📄 CALIFORNIA CAR COVER
- 📄 WILAND PUBLISHING/SUBSCRIBER

**ORDERING INSTRUCTIONS**

- To order this list, contact your List Broker and ask for NextMark List ID #311529 or click here to place your request.
- Use NextMark List Order Entry Software or Bionic Media Planning Software
- 5,000 NAME MINIMUM ORDER $0.00 MINIMUM PAYMENT
- 85% NET NAME AVAILABLE ON ORDERS OF 50,000 OR MORE ($10.00/M RUN CHARGE)
- EXCHANGE IS AVAILABLE
- REUSE IS AVAILABLE

[ Get Count ]   [ Get Pricing ]   [ Get More Information ]

*See* Complaint Ex. C.

5.      The "Masterfile" list gave renters access to the Personal Reading Information of TEN subscribers based on additional selection criteria, such as whether the subscriber is a "Home Owner", whether they are a "Renter", and can select based on the subscriber's "Age."  *Id.*

6.      TEN also offers mailing lists for other magazines that it publishes including *Motor Trend* which counts 479,577 active U.S. subscribers. As recently as June 12, 2019, TEN also offered access to its "MOTOR TREND Mailing List" at the same base rate of "$110/M." S*ee* Complaint Ex. D on the following page.

7.      Renters are able to access the Personal Reading Information of *Motor Trend* magazine subscribers based on, but not limited to, their "gender" as well as other matching and targeting data. *Id.*

5

6/12/2019                                          MOTOR TREND Mailing List

# MOTOR TREND Mailing List

Published by TEN - The Enthusiast Network (formerly Source Interlink Media). Motor Trend is the world's automotive authority, covering more cars, trucks & SUVs than any other magazine. Every issue of MOTOR TREND informs and entertains with features on the testing of both domestic and import cars, car care, and auto-industry news. It's Car of the Year award is one of the most coveted by manufacturers and they have set standards in rating consumer satisfaction in all aspects of driving.

*COUNTS THROUGH 05/22/2019*

| SEGMENTS | | |
|---|---|---|
| 479,577 TOTAL UNIVERSE / BASE RATE | | $110.00/M |
| 479,577 ACTIVE U.S. SUBSCRIBERS | | $110.00/M |
| 26,957 1 MONTH HOTLINE SUBS | | + $16.00/M |
| 79,715 3 MONTH HOTLINE SUBS | | + $11.00/M |
| 168,222 6 MONTH HOTLINE SUBS | | + $6.00/M |
| 112,639 12 MONTH EXPIRES | | $85.00/M |
| 3,874 CANADIAN SUBS | | $125.00/M |
| NON-COMPETITIVE CATALOG | | $80.00/M |
| FUNDRAISER RATE | | $75.00/M |

| | |
|---|---|
| POPULARITY: | ===== 97 |
| MARKET: | CONSUMER |
| CHANNELS: | 🖂 |
| SOURCE: | 55% DTP |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA |
| GENDER: | 9% FEMALE 88% MALE |

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | $16.00/M |
| 3 MONTH HOTLINE | $11.00/M |
| 3RD PARTY BLOW IN | $10.00/M |
| 6 MONTH HOTLINE | $6.00/M |
| GENDER/SEX | $9.00/M |
| NON RECIPROCAL FEE | $10.00/M |
| PAID | $11.00/M |
| SCF | $9.00/M |
| SOURCE | $11.00/M |
| STATE | $9.00/M |
| ZIP | $9.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | $2.00/M |
| EMAIL | $55.00/F |
| FTP | $55.00/F |

### DESCRIPTION

Published by TEN - The Enthusiast Network (formerly Source Interlink Media).

Motor Trend is the world's automotive authority, covering more cars, trucks & SUVs than any other magazine. Every issue of MOTOR TREND informs and entertains with features on the testing of both domestic and import cars, car care, and auto-industry news. It's Car of the Year award is one of the most coveted by manufacturers and they have set standards in rating consumer satisfaction in all aspects of driving.

MOTOR TREND subscribers represent the largest spectrum of buyers, enthusiasts and consumers, ranging from serious auto enthusiasts to just the curious. MOTOR TREND satisfies their thirst for knowledge about everything car-related.

```
*************** Fast Facts ****************
Median Age..............................43
    18 to 24 Years......................16%
    25 to 34 Years......................17%
    35 to 44 Years......................21%
    45 to 54 Years......................21%
    55 to 64 Years......................17%
    65+ Years............................8%
Median Household Income............$84,994
    Under $40,000.......................18%
    $40,000-$49,999......................8%
    $50,000-$74,999.....................16%
    $75,000 & Over......................58%
Married................................57%
Attended College.......................67%
Work Full Time.........................62%
******************************************
```

### ORDERING INSTRUCTIONS

- To order this list, contact your List Broker and ask for NextMark List ID #311511 or click here to place your request.
- Use NextMark List Order Entry Software or Bionic Media Planning Software
- 5,000 NAME MINIMUM ORDER $0.00 MINIMUM PAYMENT
- 85% NET NAME AVAILABLE ON ORDERS OF 50,000 OR MORE ($10.00/M RUN CHARGE)
- EXCHANGE IS AVAILABLE
- REUSE IS AVAILABLE

Get Count    Get Pricing    Get More Information

*See* Complaint Ex. D.

6

8.      By renting, exchanging, or otherwise disclosing the Personal

Reading Information of its Michigan-based subscribers between June 19, 2016 and

July 30, 2016, TEN violated the PPPA.  Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person,
> engaged in the business of selling at retail, renting, or
> lending books or other written materials ... shall not
> disclose to any person, other than the customer, a record
> or information concerning the purchase ... of those
> materials by a customer that indicates the identity of the
> customer.

PPPA § 2.

9.      Accordingly, Plaintiff brings this Class Action Complaint against

TEN for its intentional and unlawful disclosure of its customers' Personal Reading

Information in violation of the PPPA, and for unjust enrichment.

## NATURE OF THE CASE

10.     To supplement its revenues, TEN rents, exchanges, or otherwise

discloses its customers' personal information—including their full names, titles of

magazines subscribed to, and home addresses (collectively "Personal Reading

Information"), as well as myriad other personal, lifestyle, and demographic

information such as gender, age, ethnicity, income, religion, parental status, and

political affiliation—to data aggregators, data appenders, data cooperatives, and

other third parties without the written consent of its customers.

11.     By renting, exchanging, or otherwise disclosing – rather than selling

– its customers' Personal Reading Information, TEN is able to disclose the information time and time again to countless third parties.

12.     TEN's disclosure of Personal Reading Information, and other personal, demographic, and lifestyle information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.  In fact, almost any organization can rent a customer list from TEN that contains a number of categories of detailed subscriber information.  For example, almost any organization could rent a list with the names and addresses of all *Hot Rod* customers who are female, over the age of 50, and with a net worth of greater than $500,000.

13.     While TEN profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Personal Reading Information and other personal information, it does so at the expense of its customers' privacy and statutory rights because TEN does not obtain its customers' written consent prior to disclosing their Personal Reading Information.

### PARTIES

14.     Plaintiff Thomas Forton is a natural person and citizen of the State of Michigan.  Plaintiff Forton is a subscriber to *Hot Rod* magazine, and was a subscriber between June 19, 2016 and July 30, 2016, as well.  *Hot Rod* magazine is published by TEN.  While residing in, a citizen of, and present in Michigan,

Plaintiff Forton purchased his subscription to *Hot Rod* magazine directly from TEN.  Prior to and at the time he subscribed to *Hot Rod*, TEN did not notify Plaintiff Forton that it discloses the Personal Reading Information of its customers, and Plaintiff Forton has never authorized TEN to do so.  Furthermore, Plaintiff Forton was never provided any written notice that TEN rents, exchanges, or otherwise discloses its customers' Personal Reading Information, or any means of opting out.  Since subscribing to *Hot Rod*, and between June 19, 2016 and July 30, 2016, TEN disclosed, without consent or prior notice, Plaintiff Forton's Personal Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files.  Moreover, during that same period, TEN rented or exchanged mailing lists containing Plaintiff Forton's Personal Reading Information to third parties seeking to contact TEN subscribers, without first obtaining Plaintiff Forton's written consent or even giving him prior notice of the rentals, exchanges, and/or other disclosures.  Because TEN rented, exchanged, and/or otherwise disclosed his Personal Reading Information, Plaintiff Forton now receives junk mail from charities and other organizations that do not offer products or services to consumers.  These unwarranted mailings waste Plaintiff Forton's time, money, and resources.  These harassing junk mailings received by Plaintiff Forton are attributable to TEN's unauthorized rental, exchange, and/or disclosure of his Personal Reading Information.  Because

Plaintiff Forton is entitled by law to privacy in his Personal Reading Information, and because he paid money for his subscription, TEN's disclosure of his Personal Reading Information deprived Plaintiff Forton of the full set of benefits to which he was entitled as a part of his *Hot Rod* subscription, thereby causing economic harm.  Accordingly, what Plaintiff Forton received (a subscription without statutory privacy protections) was less valuable than what he paid for (a subscription with accompanying statutory privacy protections), and he would not have been willing to pay as much, if at all, for his *Hot Rod* subscription had he known that TEN would disclose his Personal Reading Information.

15.    Defendant TEN Corporation is a Delaware corporation with its principal place of business at 2221 Rosecrans Avenue, Ste 195, El Segundo, CA 90245.  TEN does business throughout Michigan and the entire United States.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

17.    The Court has personal jurisdiction over TEN because Plaintiff's

10

claims arose in substantial part from actions and omissions in Michigan, including from Plaintiff's purchase of a *Hot Rod* subscription in Michigan, TEN's direction of such *Hot Rod* subscription into Michigan, and TEN's failure to obtain Plaintiff's written consent in Michigan prior to disclosing his Personal Reading Information, including his residential address in Michigan, to another person, the effects of which were felt from within Michigan by a citizen and resident of Michigan. Personal jurisdiction also exists over TEN in Michigan because TEN conducts substantial business within Michigan, such that TEN has significant, continuous, and pervasive contacts with the State of Michigan.

18.　　Venue is proper in this District pursuant to 28 U.S.C. § 1391 because TEN does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## **FACTUAL BACKGROUND**

### ***Michigan's Preservation of Personal Privacy Act***

19.　　In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy,

respectively).

20.     Recognizing the need to further protect its citizens' privacy rights,

Michigan's legislature enacted the PPPA "to preserve personal privacy with respect

to the purchase, rental, or borrowing of certain materials," by prohibiting

companies from disclosing certain types of sensitive consumer information.  H.B.

No. 5331, 1988 Mich. Legis. Serv. 378 (West).

21.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person,
> engaged in the business of selling at retail, renting,
> or lending books or other written materials . . . *shall
> not disclose* to any person, other than the customer, a
> record or information concerning the purchase . . . of
> those materials by a customer that indicates the identity
> of the customer.

PPPA § 2 (emphasis added).

22.     Michigan's protection of reading information reflects the "gut

feeling that people ought to be able to read books and watch films without the

whole world knowing," and recognizes that "[b]ooks and films are the intellectual

vitamins that fuel the growth of individual thought.  The whole process of

intellectual growth is one of privacy—of quiet, and reflection.  This intimate

process should be protected from the disruptive intrusion of a roving eye."  S. Rep.

No. 100–599, at 6 (Statement of Rep. McCandless).

23.     As Senator Patrick Leahy recognized in proposing the Video and

Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

24.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people."  *Id.*

25.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter."  *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit A**).

26.     Despite the fact that thousands of Michigan residents subscribe to TEN's publications, TEN disregarded its legal responsibility by systematically violating the PPPA.

### *The Personal Information Market:  Consumers' Personal Information Has Real Value*

27.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson

Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[2]

28.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

29.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[4]

---

[2] The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Jan. 29, 2019).

[3] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Jan. 29, 2019).

[4] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited Jan. 29, 2019) (emphasis added).

30.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[5]

31.     The scope of data aggregators' knowledge about consumers is immense:  "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[6]

32.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[7]

33.     Recognizing the serious threat that the data mining industry poses to

---

[5] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Jan. 29, 2019).

[6] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Jan. 29, 2019).

[7] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited Jan. 29, 2019).

consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-

Partisan Privacy Caucus sent a letter to nine major data brokerage companies

seeking information on how those companies collect, store, and sell their massive

collections of consumer data.[8]

34.     In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online
> sources, data brokers have developed hidden dossiers on
> every U.S. consumer.  This large[-]scale aggregation of
> the personal information of hundreds of millions of
> American citizens raises a number of serious privacy
> concerns.[9]

35.     Data aggregation is especially troublesome when consumer

information is sold to direct-mail advertisers.  In addition to causing waste and

inconvenience, direct-mail advertisers often use consumer information to lure

unsuspecting consumers into various scams,[10] including fraudulent sweepstakes,

charities, and buying clubs.  Thus, when companies like TEN share information

---

[8] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited Jan. 29, 2019).

[9] *Id.*

[10] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited Jan. 29, 2019).

with data aggregators, data cooperatives, and direct-mail advertisers, they

contribute to the "[v]ast databases of names and personal information" that are

often "sold to thieves by large publicly traded companies," which "put[s] almost

anyone within the reach of fraudulent telemarketers" and other criminals.[11]

36.     Information disclosures like TEN's are particularly dangerous to the

elderly.  "Older Americans are perfect telemarketing customers, analysts say,

because they are often at home, rely on delivery services, and are lonely for the

companionship that telephone callers provide."[12]  The FTC notes that "[t]he

elderly often are the deliberate targets of fraudulent telemarketers who take

advantage of the fact that many older people have cash reserves or other assets to

spend on seemingly attractive offers."[13]

37.     Indeed, an entire black market exists while the personal information

of vulnerable elderly Americans is exchanged.  Thus, information disclosures like

---

[11] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times,  May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited Jan. 29, 2019).

[12] *Id.*

[13] *Fraud Against Seniors:  Hearing before the Senate Special Committee on  Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited Jan. 29, 2019).

TEN's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

38.     TEN is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue:  disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

39.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### *Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases*

40.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their personal information.

41.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[15]  As a result,

---

[14] *Id.*

[15] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-

81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

42.    Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

43.    In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[17]

44.    These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent

content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited Jan. 29, 2019).

[16] *Id.*

[17] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Jan. 29, 2019).

policies of protecting their personal data.[18]

45.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19]  As such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### TEN Unlawfully Rents, Exchanges, And Discloses Its Customers' Personal Reading Information

46.     TEN maintains a vast digital database comprised of its customers' Personal Reading Information.  TEN discloses its customers' Personal Reading Information to data aggregators and appenders who then supplement that information with additional sensitive personal information about each TEN customer, including gender, purchasing habits and charitable.  (*See, e.g.*, **Exhibits B-D**).

---

[18] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Jan. 29, 2019).

[19] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited Aug. 30, 2018) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

47.    TEN then rents and/or exchanges its mailing lists—which include subscribers' Personal Reading Information identifying which individuals purchased which magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits B-D**).

48.    TEN also discloses its customers' Personal Reading Information to data cooperatives, who in turn, give TEN access to their own mailing list databases.

49.    As a result of TEN's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from TEN that identify TEN customers by their most intimate details:  income, political affiliation, religious practice, and charitable donations.  TEN's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.  For example, TEN will rent—to almost any organization willing to pay for it—a list with the names and addresses of all *Hot Rod* customers who are female, over the age of 50, with a net worth of greater than $500,000, and a history of charitable donations.

50.    TEN does not seek its customers' prior written consent to any of

these disclosures and its customers remain unaware that their Personal Reading Information and other sensitive personal information is being rented and exchanged on the open market.

51.      Consumers can sign up for TEN subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribes, TEN never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy. Consequently, TEN uniformly fails to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Personal Reading Information.

52.      As a result, TEN disclosed its customers' Personal Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[20] – to anybody willing to pay for it.

53.      By and through these actions, TEN has intentionally disclosed to third parties its Michigan customers' Personal Reading Information without consent, in direct violation of the PPPA.

---

[20] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited Jan. 29, 2019).

## CLASS ACTION ALLEGATIONS

54.     Plaintiff seeks to represent a class defined as all Michigan residents who, at any point in time between June 19, 2016 and July 30, 2016, had their Personal Reading Information disclosed to third parties by TEN without consent (the "Class").  Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

55.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

56.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  (a) whether TEN is a "retailer or distributor" of publications (*i.e.*, magazines); (b) whether TEN obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information; (c) whether TEN's disclosure of Plaintiff's and the Class's Personal Reading Information violated the PPPA; and (d) whether TEN's rental, exchange, and/or disclosure of Plaintiff's and the Class's Personal reading

23

Information constitutes unjust enrichment.

57.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

58.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

59.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision

24

by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Violation of the Preservation of Personal Privacy Act
### (PPPA § 2)

60.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

61.    Plaintiff brings this claim individually and on behalf of members of the Class against Defendant TEN.

62.    As a magazine publisher that sells subscriptions to consumers, TEN is engaged in the business of selling written materials at retail. *See* PPPA § 2.

63.    By purchasing a subscription to *Hot Rod* magazine, Plaintiff purchased written materials directly from TEN. *See* PPPA § 2.

64.    Because Plaintiff purchased written materials directly from TEN, he is a "customer" within the meaning of the PPPA. *See* PPPA § 1.

65.    At various times between June 19, 2016 and July 30, 2016, TEN disclosed Plaintiff's Personal Reading Information, which identified him as a *Hot Rod* customer, in at least three ways.

66.    First, TEN disclosed mailing lists containing Plaintiff's Personal Reading Information to data aggregators and data appenders, who then

supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to TEN.

67.    Second, TEN disclosed mailing lists containing Plaintiff's Personal Reading Information to data cooperatives, who in turn gave TEN access to their own mailing list databases.

68.    Third, TEN rented and/or exchanged its mailing lists containing Plaintiff's Personal Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

69.    Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and TEN was able to increase its profits gained from the mailing list rentals and/or exchanges.

70.    By renting, exchanging, or otherwise disclosing its customer lists, between June 19, 2016 and July 30, 2016, TEN disclosed to persons other than Plaintiff records or information concerning his purchase of written materials from TEN.  *See* PPPA § 2.

71.    The information TEN disclosed indicates Plaintiff's name and address, as well as the fact that he subscribed *Hot Rod*.  Accordingly, the records or information disclosed by TEN indicate Plaintiff's identity.  *See* PPPA § 2.

26

72.     Plaintiff and the members of the Class never consented to TEN disclosing their Personal Reading Information to anyone.

73.     Worse yet, Plaintiff and the members of the Class did not receive notice before TEN disclosed their Personal Reading Information to third parties.

74.     On information and belief, TEN's disclosures, between June 19, 2016 and July 30, 2016, of Plaintiff's and the Class's Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

75.     TEN's disclosures, between June 19, 2016 and July 30, 2016, of Plaintiff's and the Class's Personal Reading Information were not made to collect payment for their subscriptions.

76.     TEN's disclosures, between June 19, 2016 and July 30, 2016, of Plaintiff's Personal Reading Information were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase TEN's revenue.  Accordingly, TEN's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

77.     By disclosing Plaintiff's Personal Reading Information, between June 19, 2016 and July 30, 2016, TEN violated Plaintiff's and the Class's statutorily-protected right to privacy in their reading habits.  *See* PPPA § 2.

78.     Additionally, because Plaintiff and the members of the Class paid for

their subscriptions to TEN's publications, and TEN was obligated to comply with the PPPA, TEN's unlawful disclosure of Plaintiff's and the other Class members' Personal Reading Information deprived Plaintiff and the Class members of the full value of their paid-for subscriptions. Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, TEN's unlawful rental, exchange, and/or other disclosure of their Personal Reading Information caused them to receive less value than they paid for, thereby causing them economic harm.

79. Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine publication subscription that keeps their Personal Reading Information private is more valuable than one that does not.

80. Accordingly, had Plaintiff been adequately informed of TEN's disclosure practices, he would not have been willing to purchase his *Hot Rod* subscription at the price charged, if at all. Thus, TEN's unlawful disclosures caused Plaintiff economic harm.

81. TEN's disclosure of Plaintiff's Personal Reading Information to third parties has also caused an influx of third party print advertisements.

82. As a result of TEN's unlawful disclosure of their Personal Reading Information, Plaintiff and the members of the Class have suffered privacy and

28

economic injuries.  On behalf of himself and the Class, Plaintiff seeks:  (1) an

injunction requiring Defendant TEN to obtain consent from Michigan customers

prior to the disclosure of their Personal Reading Information as required by the

PPPA; (2) actual damages, including disgorgement, or $5,000.00, whichever is

greater, per Class member pursuant to PPPA § 5(a); and (3) costs and reasonable

attorneys' fees pursuant to PPPA § 5(b).

**COUNT II**
**Unjust Enrichment**

83.     Plaintiff repeats the allegations contained in the paragraphs above as if

fully set forth herein.

84.     Plaintiff brings this claim individually and on behalf of the members

of the Class against Defendant TEN.

85.     Plaintiff and the Class members conferred benefits on TEN by

providing TEN with their Personal Reading Information and paying TEN for their

magazine publication subscriptions.

86.     TEN received and retained the information and money belonging to

Plaintiff and the Class when Plaintiff and the Class subscribed to TEN's

publications.

87.     Because TEN received and processed Plaintiff's and the Class's

subscription payments and Personal Reading Information, and because TEN has

employees and/or agents handling customer accounts and billing as well as

29

customer data, TEN appreciates or has knowledge of such benefits.

88.    Under the PPPA, Plaintiff and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

89.    Under principles of equity and good conscience, because TEN failed to comply with the PPPA, TEN should not be allowed to retain the full amount of money Plaintiff and the Class paid for their subscriptions or the money it received by renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal Reading Information.

90.    Moreover, TEN should not be allowed to retain the monies it received as a result of renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal Reading Information.

91.    Plaintiff and the other Class members have suffered actual damages as a result of TEN's unlawful conduct in the form of the value Plaintiff and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information.  This amount is tangible and will be calculated at trial.

92.    Additionally, Plaintiff and the Class members have suffered actual damages inasmuch as TEN's failure to inform them that it would disclose their Personal Reading Information caused them to purchase magazine publication subscriptions when they otherwise would not have.

93.    Further, a portion of the purchase price of each TEN magazine

subscription sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' Personal Reading Information, as required by the PPPA.  Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their Personal Reading Information—and because Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

94.     To prevent inequity, TEN should return to Plaintiff and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from TEN's rental, exchange, and/or other disclosure of Plaintiff's and the Class's Personal Reading Information.

95.     Accordingly, Plaintiff and the Class members seek an order declaring that TEN's conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by TEN through its rental, exchange, and/or other disclosure of Plaintiff's and the Class's Personal Reading Information.

## **PRAYER FOR RELIEF**

96.     WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

> A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as

representative of the Class and Plaintiff's attorneys as
Class Counsel to represent the Class;

B.    For an order declaring that Defendant's conduct as
described herein violates the Preservation of Personal
Privacy Act, PPPA;

C.    For an order finding in favor of Plaintiff and the Class on
all counts asserted herein;

D.    For an award of actual damages or $5,000, whichever is
greater, to Plaintiff and each Class member, as provided
by the Preservation of Personal Privacy Act, PPPA § 5(a);

E.    For prejudgment interest on all amounts awarded;

F.    For an order of restitution and all other forms of equitable
monetary relief;

G.    For injunctive relief as pleaded or as the Court may deem
proper; and

H.    For an order awarding Plaintiff and the Class their
reasonable attorneys' fees and expenses and costs of suit.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  June 19, 2019

Respectfully submitted,

**THOMAS FORTON**,

By: _____ */s Philip L. Fraietta* _____
One of Plaintiff's Attorneys

Joseph I. Marchese
jmarchese@bursor.com
Philip L. Fraietta
pfraietta@bursor.com
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163

Frank S. Hedin*
fhedin@hedinhall.com
David W. Hall*
dhall@hedinhall.com
HEDIN HALL LLP
1395 Brickell Avenue, Suite 900
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801
*Application for Admission Forthcoming

Nick Suciu III
nicksuciu@bmslawyers.com
BARBAT, MANSOUR & SUCIU PLLC
1644 Bracken Road
Bloomfield Hills, Michigan 48302
Tel: 313.303.3472

*Counsel for Plaintiff Thomas Forton*